IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

JUSTIN L. RODRIQUEZ,

      Plaintiff,

v.
                              Civil Action No. 1:12cv99
                              (The Honorable Irene M. Keeley)

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the

Social Security Administration ("Defendant" and sometimes "Commissioner") denying the Plaintiff's

claim for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act.

The matter is awaiting decision on cross motions for summary judgment and has been referred to the

undersigned United States Magistrate Judge for submission of proposed findings of fact and

recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

Plaintiff filed his application for SSI in January 2009, alleging disability since June 5, 2007,

due to "dyslexia and depression" (R. 133, 223).[1] He states his conditions limited his ability to work

because he could not read, had difficulty understanding directions, had difficulty remembering

directions, and had suicidal ideations (R. 223). He was denied at the initial level on January 11, 2009

---

[1] Plaintiff filed an earlier applications for SSI, once during childhood, all of which were
denied at the initial level and never appealed. He had not been represented.

(R. 72). On April 7, 2009, Plaintiff retained Harold Bailey, Jr., an attorney, to represent him (R. 89).[2]

Plaintiff's claim was denied at the reconsideration level on April 15, 2009 (R. 90). Plaintiff, through counsel, requested a hearing before an Administrative Law Judge (R. 93), which was granted. Administrative Law Judge Norma Cannon ("ALJ"), held an Administrative hearing on August 31, 2010, at which Plaintiff, represented by counsel, and Vocational Expert James Ganoe ("VE") testified (R. 37-69). During the hearing, Plaintiff's counsel advised that his main argument was really regarding Plaintiff's verbal IQ of 63, and the 23 point difference between it and his performance IQ of 86. He also noted Plaintiff's fine motor skills problems, and an organic disability learning problem that prevented him from remembering things, noting that even Psychologist Morgan found his recent recall severely deficient. Counsel particularly argued that Plaintiff met Listing 12.05 C for mental retardation.

On October 20, 2010, the ALJ entered a decision finding Plaintiff had severe impairments consisting of a reading disorder, mathematics disorder, disorder of written expression, and major depressive disorder (R. 24). She found he was not disabled because there were jobs existing in significant numbers that he could perform (R. 31). She did not find him mentally retarded. Plaintiff appealed the ALJ's decision to the Appeals Council, which denied his request for review on April 20, 2012, making the ALJ's decision the final decision of the Commissioner (R. 1).

## II. FACTS

Plaintiff was born on March 29, 1986, and was twenty-four (24) years old at the time of the administrative hearing (R. 38). By 9th grade, Plaintiff was spending 86% of his time in public school

---

[2]

Mr. Bailey stated during the administrative hearing that Plaintiff had never had previously had representation, and that Plaintiff's aunt arranged for representation on this occasion.

in Special Education classes. He repeated at least the first grade, and quit school at the age of 16, in the beginning of his Freshman year of high school. He worked for about 1 ½ days detailing cars, then got a job as a stock boy in a Dollar Store, a job which he kept for about 6 months. He had been hired for that job by a teacher of one of his special classes, a non-profit program called "Mountain Cap" that served disadvantaged youth and tried to provide them educational skills necessary to pass the GED, work skills, and social skills to transition into independent adult living. Plaintiff was unable to pass the GED, despite trying. She hired his brother and him together, so his brother could help and supervise him. He was let go from the job, as he was unable to do it without his brother's help. The record indicates he made $35.68 in 2004, $673.97 in 2005, and $81.20 in 2006 (R. 137).

The facts of this case are fairly simple. Plaintiff was born on March 29, 1986 (R. 149). On September 28, 1999 (13 ½ years old), Plaintiff underwent a Psychoeducational Evaluation by Certified School Psychologist David Wamsley (R. 282). Plaintiff was just beginning 7th grade. Plaintiff believed he had repeated kindergarten but was not sure. He received services for Learning Disabled Students. He was dressed appropriately. He was relatively reserved and spoke only when addressed by the examiner. His responses were very brief. He did not respond when asked about the type of job he would like to have as an adult. When asked a second time, he answered, "Valleyball player." The examiner asked if he had meant "Volley Ball" and Plaintiff "just shook his head to indicate 'Yes.'"

Plaintiff's IQ tests resulted in scores of 63 Verbal, 86 Performance, and 72 full scale (at the 1st, 18th, and 3rd percentile for people his age, respectively) (R. 283). His subtest scores ranged from 1 - 9. As the psychologist noted: "The average score is 10. Any change of 3 points or more is considered to be significant." (Id.) Plaintiff did not get a "10" (average) on any subtest. His highest score was a 9, in "Picture Completion," and he got 8's on "Picture Arrangement," "Block Design," and "Object

3

Assembly." He received a 1 on information, 3 on comprehension, and 4 on vocabulary and arithmetic, each of which is clearly "considered to be significant." School Psychologist Wamsley opined that Plaintiff's "General intellectual functioning fell within the upper end of the Mildly Mentally Impaired range." (R. 283). He continued, however, that Plaintiff's nonverbal functioning, as indicated by the performance part of the test, was within the lower average range. Despite this finding, Psychologist Wamsley also noted:

> In most test areas Justin struggled and scored well below normal. This included:
>
> Information learned in previous home and school experiences. This included long term memory for factual detail.
>
> Abstract thinking, including the ability to generalize from one learning situation to another.
>
> Basic Arithmetic reasons. This involves using math computational skills that are age appropriate for solving the types of problems that might occur in every day life.
>
> Word knowledge including definitions, verbal expression and general verbal reasoning.
>
> Verbal logical problem solving. This includes "common sense" reasoning associated with experiences considered typical of most students.
>
> Ability to make a quick transition from one item to another on a timed paper and pencil task.
>
> Justin's potential for success in regular classroom learning situations would appear to be somewhat lower than most students his age. His weaknesses in the several verbal and one nonverbal areas suggest that he would have difficulty understanding and applying the complex types of information usually emphasized in the classroom.

(R. 284)(emphasis added).

Regarding the Human Figure Drawing Test, Mr. Wamsley opined that the quality of Plaintiff's drawing was very low average, consistent with the Performance part of the IQ test. "Indicators were present suggesting anxiety and tension. It was the examiner's impression that Justin may feel self-

conscious about his lack of success in a variety of areas, particularly school work."

Regarding the Bender Visual Motor Gestalt Test, "A number of errors were present which reduced Justin's overall score. Fine motor skills were found to be far below the level expected of a young man his age . . . ."   (R. 284) (emphasis added).

Plaintiff's achievement tests (grade level and percentile)  resulted in the following:

Basic Reading–first grade, -1 percentile.[3]

Mathematics Reasoning – third grade, 4th percentile.

Spelling– second grade, 1st percentile.

Reading Comprehension – first grade, -1 percentile.

Numerical Operations – second grade, -1 percentile.

The Composite of the above was grade one for reading and grade two for math, at the -1 and 1st percentile, respectively.[4] Notably, "Extreme deficits were found in all academic areas . . . He could be considered almost a nonreader." (R. 285)(emphasis added). "[His] limited success in Arithmetic suggested that he has not yet learned addition and subtraction or multiplication facts. He relied on counting or making marks on paper to solve relatively low level items." (Emphasis added).

Based on all of the above, Mr. Wamsley opined that Plaintiff had "extreme deficits in basic reading, spelling, and arithmetic." He continued: "Many of his learning characteristics appear to be similar to those associated with students functioning in the Mildly Mentally Impaired Range."

---

[3]Significantly, Plaintiff was 13 and in the 7th grade.

[4]A score at the 1st percentile means the student scored as well as, or better than, only 1% of students his age on the test. www.aacs.org (Accessed on January 25, 2013). The undersigned was unable to find a reference to a negative 1 percentile, however, and frankly cannot imagine how an individual can perform the same or better than fewer than 0% of other test-takers. Clearly, however, the best interpretation would be that Plaintiff scored only at the 1st percentile on those tests also.

5

(Emphasis added). He then, however, wrote: "On the other hand, he demonstrated low average functioning in selected nonverbal parts of the WISC-III and his Performance score would be considered well within the lower average range. Using this as a point of comparison, he would also appear to have some of the characteristics associated with students considered Learning Disabled." (R. 285). (Emphasis added).

Mr. Wamsley then recommended EITHER services for Mildly Mentally Impaired students OR continuation of services for Learning Disabled students.

Plaintiff's school's Eligibility Committee subsequently met to reevaluate Plaintiff's Individualized Education Program ("IEP")(R. 160). It determined to continue Plaintiff in the program for Specific Learning Disabilities. It did not identify him as Mentally Impaired. Specifically, the committee noted his general intellectual function was at or above one standard deviation below the mean, based on his performance IQ (R. 161).

At age 15, Plaintiff was reevaluated pursuant to his Individualized Education Program ("IEP") (R. 149), for transition to high school. His goals at the time were to live at home through high school and to graduate from high school. He had no community activities. He was interested in becoming a painter. He was currently enrolled in a Severe Learning Disability Reading Class, reading on the lower third-grade level. He was also enrolled in Severe Learning Disabled Math Class. He had shown "great improvement with basic operations involving addition, subtraction, and multiplication and division using one digit." (Emphasis added). It was also a goal set for him to obtain a driver's license (R. 152). Employment, living skills, and functional vocational evaluation were not recommended at that time. He was to participate in Reading, Math, English, Health, and Science in a Special Education Environment. Subsequently, an addendum to his IEP increased his time spent in Special Education

to 86%, adding Social Studies to the list of classes in which he could not learn in regular classes.

Plaintiff did complete some type of computer training in 2005 (R. 174).

On June 26, 2007, Plaintiff underwent a Mental Assessment for the State Agency, performed by Psychologist Morgan Morgan (R. 305). Plaintiff was 20 years old. He was appropriately groomed and attired. He drove himself to the appointment, accompanied by his aunt. He was cooperative and compliant. He reported he was applying for disability due to problems with reading, spelling, and doing math. He had last worked in January 2006, and believed he likely lost the job due to his poor reading skills. He lived with his grandmother, brother and an uncle, receiving only food stamps.

Plaintiff described his mood as typically happy. He displayed academic deficiency. He said his aunt generally helped him manage personal affairs. His appetite and sleep were good, his energy was normal, and he denied suicidal ideations. He had not undergone any mental health treatment. He left school in the 9th grade. He received his driver's license only after seven oral test attempts. He did not participate in organized school activities, and had no history of disciplinary problems. Plaintiff was not married and did not have children, but he reported having had a steady girlfriend from 2003-2005.

Upon Mental Status Examination, Plaintiff was appropriately attired and had good hygiene and grooming. He had nonprofessional tattoos on his hands and arm. He was cooperative and compliant. Eye contact was normal. His spontaneity was mildly deficient. Verbal responses were normal, although he displayed a mild level of introversion. His speech was normal. He was oriented to time, name and place, but unsure of the date. His mood was cheerful, and he displayed a broad range of affect. His insights were mildly deficient. His judgment was poor. His immediate recall was normal, his remote recall was mildly deficient, and his recent recall was severely deficient. His concentration

was mildly deficient (R. 307).

IQ testing results were verbal 70, performance 91, and full scale, 78. The results were valid and appeared to be based on good effort. There was again a significant differential between the verbal and performance aspects. Due to this, Mr. Morgan explained that the full scale IQ was not a good indicator of Plaintiff's overall intelligence. Mr. Morgan instead found Plaintiff's "presentation" suggested he would typically function between the low average with average range of intelligence (R. 308).

Valid achievement test scores showed Plaintiff read at the 2nd grade level, spelled at the 3rd grade level, and performed arithmetic at the 2nd grade level. Mr. Morgan diagnosed a Reading Disorder, Mathematics Disorder, and Disorder of Written Expression, and opined Plaintiff's prognosis was "Poor." He opined that Plaintiff would struggle to appropriately manage his own finances.

On July 2, 2007, State agency reviewing psychologist Bartee completed a Mental Residual Functional Capacity Assessment ("MRFC") of Plaintiff, based solely on category 12.02, for Organic Brain Disorder. He did not mention Listing 12.05 for mental retardation or impairment. He then found Plaintiff would be markedly limited in his ability to understand, remember, and carry out detailed instructions; moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. He would not be significantly limited in any other mental activity. Dr. Bartee also completed a Psychiatric Review Technique ("PRT"), based on 12.02 for organic mental disorder, finding Plaintiff had only

learning disabilities (R. 316). He concluded Plaintiff had a mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and had no episodes of decompensation.

On March 2, 2009, Psychologist Morgan completed another mental assessment of Plaintiff for the State agency (R. 338). Plaintiff was now nearly 23. He was adequately groomed and attired, and had driven himself to the appointment. He again brought his aunt with him. He was cooperative and compliant. His motor functioning was mildly retarded. Plaintiff said he was applying for disability due to his history of special education with poor reading, math, and spelling, along with depression. He became unable to work in 2006 due to his spelling problems. He reported recurrent, depressive episodes. He struggled with attention and concentration and was forgetful. He became frustrated easily and became irritable. He was socially withdrawn. He was currently having problems sleeping due to ruminations over stressors. He had occasional suicidal ideations, but said he would not commit suicide due to his friends' affection and assistance. He was eating less, sometimes not eating for days. He reportedly had lost 15 pounds. He reported weekly crying spells.

Mr. Morgan rather inconsistently stated that Plaintiff's grooming and hygiene were adequate, while observing his hair was somewhat oily and he may not have bathed in the last day or so (R. 340). Plaintiff's mood was dysphoric and his affect was significantly restricted. His insights were mildly deficient and judgment was deemed poor. Immediate recall was mildly deficient, recent recall was moderately deficient, and remote recall was mildly deficient. Concentration was also mildly deficient, and he displayed motor retardation during the assessment.

Mr. Morgan did not repeat any testing. He diagnosed major depressive disorder, recurrent, severe, without psychotic features; reading disorder; mathematics disorder; and disorder of written

expression (R. 341).

State agency reviewing psychologist Bartee completed another PRT on March 10, 2009, based on an organic mental disorder (learning disorder) and an affective disorder (depression) (R. 348). He found Plaintiff would have moderate difficulties in maintaining social functioning and concentration, persistence or pace, mild restriction of activities of daily living, and no episodes of decompensation (R. 358).

At the Administrative Hearing, Plaintiff testified he lived in a one room apartment upstairs from his grandmother. He used to take care of his fish and bird but gave them away because he "couldn't handle it anymore." He had never really lived apart from family. He did not recall filling out the social security applications, although he knew what an application was -"Something where you write your stuff - - Yeah. Like a thing to get a job with." He then testified that someone helped him with the applications – his aunt, his grandmother, and his brother. He testified he could read "a little." He had never had a lawyer help him with his social security applications before.

Plaintiff testified that he worked a little bit at the Dollar General. He got the job because the manager used to be his special ed teacher. His brother also worked there and helped him to "do stuff." The "stuff" he would do was putting "canned food and stuff like that on the shelves." He would forget how to do it, however. He tried to get his GED, with his brother, but could not pass. He had worked detailing cars but "always got it wrong and they kept yelling at me." He testified that he drove, but always had someone with him. He also did not go far outside Buckhannon, because he would "get lost and not know where to go." He did not go shopping by himself. Someone went with him to help him find the store, and to help him get what he wanted to buy. He testified he would not know if he got the correct change from one hundred dollars, and would not even know how much a hundred dollars

was. He had no trouble finding the right color clothes, but he needed help finding the right size.

Plaintiff testified he did not need help getting dressed, but he would wear the same clothes almost every day if someone didn't tell him not to. He testified he was wearing the same clothes at the hearing he had worn the day before. His aunt tried to show him how to wash clothes, but he had trouble because he "fouled up": "Where you put the stuff in the little cup and see how much you got to have and put it in there and start the machine and stuff." (R. 51).

Plaintiff's aunt testified Plaintiff needed someone to go with him, even to Wal Mart (R. 57). He also had someone with him when he drove. Otherwise, "he gets lost." He did not know what to buy at Wal Mart and did not know what size to buy. He dressed himself, but would possibly wear the same clothes day after day if someone didn't tell him. He could take care of his own apartment. He did not file his Social Security claims and she did not think he really understood the process. She testified he really did not do much of anything without his family's help. He got the job at the Dollar Store from a former teacher, still had the help of his brother to do it, and still lost the job.

The ALJ asked the Vocational Expert ("VE") if there would be any jobs for an individual of Plaintiff's age, education, and experience, at any exertional level, with no reading, writing or math required, avoiding hazards, at entry level unskilled one- to- two- step simple instructions. The work must be routine and repetitive and with things as opposed to people. There was to be limited contact with coworkers and the public, no independent decision making, and no production line work. The VE testified there would be a significant number of jobs available for that individual, including cleaner, washer/cleaner, and grader/sorter (agricultural).

Upon cross examination, the VE testified that if the hypothetical person had to be retold how to do the job every day, the individual would be let go.

11

## III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Cannon made the following findings:

1.  The claimant has not engaged in substantial gainful activity since June 5, 2007 (20 CFR 416.971 *et seq.*).

2.  The claimant has the following severe impairments: reading disorder; mathematics disorder; disorder of written expression; and major depressive disorder (20 CFR 406.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4.  After careful consideration of the entire record, the undersigned d finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: is unable [sic] to perform jobs requiring reading, writing, or math; should avoid exposure to hazards, such as dangerous moving machinery or unprotected heights; is limited to the performance of entry level, unskilled, routine, repetitive work involving simple, one-to-two-step instructions and working with things as opposed to people; can have only limited contact with coworkers and the public; and is limited to jobs requiring no independent decision making or production line work.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on March 29, 1986 and was 21 years old, which is defined as a as a "younger individual age 18-49" on the date the application was filed (20 CFR 416.963).

7.  The claimant is functionally illiterate and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a).

12

10.    The claimant has not been under a disability, as defined in the Social Security
       Act, since June 5, 2007 (20 CFR 416.920(g)).

(R. 22-32).

On December 5, 2011, Counsel for Plaintiff wrote to the Appeals Council, arguing that

the ALJ's decision was based on an error of law because she failed to consider Listing

12.05C, for Mental Retardation.  The Appeals Council denied review.

## IV.  DISCUSSION

### A.  Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and whether

the correct law was applied."  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial

evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a

preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze,

368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Secretary's decision, the reviewing court must

also consider whether the administrative law judge applied the proper standards of law:  "A factual

finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law."  Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B.  Contentions of the Parties

Plaintiff contends:

1.     The ALJ's decision is based on an error of law because the ALJ failed to

13

consider Listing 12.05C.

2.    The ALJ erred by failing to find Plaintiff's condition met Listing 12.05C.

3.    The fully favorable decision in Plaintiff's subsequent application warrants remand of the ALJ's unfavorable decision.

The Commissioner contends:

1.    The ALJ did consider whether Plaintiff's cognitive functioning qualified for benefits pursuant to 12.05C.

2.    The ALJ properly determined that the overall record failed to establish that Plaintiff satisfied the threshold requirement of 12.05C, namely, he submitted no evidence that established that he had significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.

3.    Given the difference in evidentiary background, the ALJ's 2012 decision is not cause for the Court to remand Plaintiff's case.

## C. Failure to Find Plaintiff's Condition Met Listing 12.05C

The undersigned shall discuss the contentions in a slightly different order than argued. Plaintiff argues the ALJ erred by not finding his mental condition met Listing 12.05C, for mental retardation. Defendant contends the ALJ properly determined that the overall record failed to establish that Plaintiff satisfied the threshold requirement of 12.05C, namely, he submitted no evidence that established that he had significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period.

At the third step in the sequential evaluation process, the ALJ must determine whether a claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(e)). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and

14

meets the duration requirement (20 CFR 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step. In this case, the ALJ found at Step Two, that Plaintiff had the severe impairments of a reading disorder, a mathematics disorder, disorder of written expression, and major depressive disorder (R. 24). The ALJ did not find mental retardation as an impairment. This line of reasoning followed that of the school and consulting agency psychologists who both concluded that, despite Plaintiff's verbal IQ within the mentally-retarded range, he was better diagnosed with severe disorders of reading, math, and written expression. The State agency psychologists then evaluated Plaintiff only under Listing 12.02 for Organic Brain Disorder, failing to evaluate him under 12.05 for Mental Retardation. The ALJ at Step Three likewise evaluated Plaintiff under Listing 12.02 and not Listing 12.05.

The Fourth Circuit discussed this issue in the very recent case, Jackson v. Astrue, 467 Fed. Appx. 214, 2012 WL 580239 (4th Cir. 2012)(unpublished).[5] The only issue on appeal in Jackson was whether the ALJ properly evaluated the claimant's case at the third step. Jackson argued that the ALJ erred by concluding that her level of cognitive functioning did not meet or equal Listing 12.05. The Fourth Circuit first found undisputed evidence that Jackson's IQ scores were within the 60-70 range, as evidence by a court-ordered IQ test, as well as school records from her childhood. The court also found she satisfied the second prong because she suffered from severe impairments of depression and diminished intellectual functioning. The court then found, as does the undersigned in this case, that the sole remaining issue was "whether substantial evidence supports the finding that Jackson has failed to establish the final deficits-in-adaptive-behavior requirement." Id. at 218.

The Fourth Circuit stated:

_____

[5]Pursuant to F.R.A.P. 32.1(a) and (b), a copy of Jackson is attached.

> Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

Id. (citing Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). In support of that prong, Jackson submitted evidence that she had deficiencies in the areas of functional academic skills, social/interpersonal skills and communication, self-care, safety, and health. She testified she was in special needs classes, that she dropped out of school in the tenth grade, and that she had been unable to obtain her GED. Moreover she read at a sixth-grade level, and her cognitive functioning had been evaluated as within the "mildly mentally retarded range of intellectual functioning." The ALJ found that Jackson had failed to submit documentary evidence of her impairments, and also found her testimony regarding the same not credible.

Jackson submitted additional evidence to the Appeals Council, including school records which showed she was identified as a special needs student as early as the seventh grade. The Fourth Circuit commented: "What is more, they demonstrate that further academic testing during that time showed Jackson to be severely deficient in her intellectual abilities, and in particular, reported her as having a verbal IQ of 67." Id.

The Fourth Circuit then held as follows:

> Not only did these forms provide documentation that the ALJ's decision was lacking and eliminate the ALJ's very reason for denying Jackson's claim, they also reinforced the credibility of Jackson's testimony. Moreover, information reflected in the school record is directly material to the final prong of Listing 12.05C – the question of whether Jackson suffered "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period . . . before age 22."

Because this school evidence was submitted to the Appeals Council, however, and not to the ALJ, the Fourth Circuit remanded the case for consideration of the new and material evidence.

In the present case, however, nearly identical evidence was submitted to the ALJ. In fact, Plaintiff's deficits were much greater than Jackson's. Plaintiff here was identified as a special needs student very early in school. He repeated kindergarten or first grade, and was in Special Education classes most of the day (by 9th grade, 86% of the day). Plaintiff was in the first percentile in spelling and math, and the negative 1 percentile for basic reading, reading comprehension, and numerical operations, meaning he performed worse than all or nearly all students of his age. In seventh grade, at age 13, he read at the first grade level and performed math at the second grade level. Mr. Wamsley expressly stated:

> Extreme deficits were found in all academic areas . . . He could be considered almost a nonreader [and his] limited success in Arithmetic suggested that he has not yet learned addition and subtraction or multiplication facts. He relied on counting or making marks on paper to solve relatively low level items.

Plaintiff dropped out of school in the 9th grade, at age 16, and has been unable to obtain his GED. He finally obtained a drivers' license after seven tests, all administered orally.

The school psychologist, Mr. Wamsley, expressly found, based on the IQ tests, that Plaintiff's "general intellectual functioning fell within the upper end of the Mildly Mentally Impaired range." While opining that Plaintiff would appear to have "some" of the characteristics associated with students considered Learning Disabled, he also found that "many" appeared similar to those associated with students functioning in the Mildly Mentally Impaired Range. His very first recommendation was that consideration may be given to services for Mildly Mentally Impaired students or continuation of services for Learning Disabled students.

Defendant argues that Plaintiff's IQ scores at age 13 should not be regarded as proof of his "general intellectual functioning . . . in the Mildly Mentally Impaired Range," even though Mr. Wamsley used those exact words, because "[t]he regulations state that a child's IQ score tends to

17

stabilize by the age of 16; therefore, IQ test results obtained before age 16 are considered current for only two years when the IQ is above 40. 20 C.F.R. pt 404, subpt. P, App. 1, section 112.00(D)(10). Thus, Plaintiff's WISC-III scores could not be considered current evidence of plaintiff's functioning under the regulations." The undersigned disagrees. First, the regulation cited by the defendant is applicable to children and to childhood disability. Second, and more importantly, that regulation exists due to the fact that children's IQ's may not "stabilize" until age 16. Here, Plaintiff's IQ results at age 20 were very similar to the results at age 13 (63 Verbal, 86 Performance, and 72 full scale at age 13, and verbal 70, performance 91, and full scale, 78 at age 20). Most significantly, he continued to have a test result at the applicable level of 60-70. The Fourth Circuit in <u>Jackson</u> and this District in <u>Oldaker</u> also found testing done before age 16 to be relevant to a finding of functional deficits.

Upon consideration of all of the above, the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff did not meet or equal Listing 12.05C. In fact, the undersigned finds the evidence indicates that Plaintiff did meet the Listing and was therefore disabled since June 5, 2007, and this case should be reversed and remanded for an award of benefits.

### D. Failure to Consider Listing 12.05C

Should the District Judge disagree with reversal and remand for an award of benefits, the undersigned alternatively recommends the decision be reversed and remanded for consideration of Listing 12.05C at Step Three of the sequential evaluation. Step Three of the sequential evaluation requires the ALJ to identify the relevant listed impairments and compare the listing criteria with the evidence of the plaintiff's symptoms. <u>See</u> <u>Cook v. Heckler</u>, 783 F.2d 1168 (4th Cir. 1986)("The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of Cook's symptoms. Without such an explanation, it is simply

18

impossible to tell whether there was substantial evidence to support the determination."). Listing 12.00 provides, in pertinent part:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, <u>we will find that your impairment meets the listing</u>. Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to perform basic work activities, *i.e.*, is a "severe" impairment(s), as defined in section 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in sections 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work . . . .

(Emphasis added). The undersigned finds that 12.05C is relevant to Plaintiff's claim. Listing 12.05C Provides:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period ; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C or D are satisfied . . . .

> C. A valid verbal performance, <u>**or**</u> full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 section 12.05C(emphasis added).

" Where more than one IQ is derived from the administered IQ test, the lowest score is to be used in conjunction with 12.05C." <u>Rainey v. Heckler</u>, 770 F.2d 408 (4th Cir. 1985). It is undisputable that Plaintiff had a valid verbal IQ score of 60 through 70. In fact, at 13 years of age,

he had a verbal IQ score of 63. In 2007, he had a verbal IQ score of 70. Both scores were considered valid, and both evaluators found Plaintiff had made a good effort at the tests.

Because mental retardation is a lifelong condition, a claimant must show that the condition predates age 22. Luckey v. United States Dept. of Health and Human Services, 890 F.2d 666 (4th Cir. 1989)("Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22" ))(citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 section 12.05.) Again, it is undisputable that Plaintiff's condition predates age 22. The first IQ test in the record was at age 13, and Plaintiff had already repeated at least one grade, and was in Special Education classes a majority of his class time.

In this case it is also undisputable that Plaintiff had an other impairment "imposing an additional and significant work-related limitation of function." Id. The ALJ herself found he had major depressive disorder, a severe impairment. The very definition of a "severe impairment" is one that significantly limits an individual's ability to perform basic work activities. 20 C.F.R. section 416.920(c).

The ALJ did somewhat explain her reasoning behind evaluating Plaintiff under Listing 12.02 instead of 12.05. She cited the school psychologist, who noted Plaintiff's performance score would be considered well within the lower average range, and noted that he appeared to have some of the characteristics associated with students considered learning disabled. Significantly, however, that same psychologist also opined that "many" (as opposed to only "some") of Plaintiff's learning characteristics were similar to those associated with students functioning in the mild mentally impaired range. The ALJ also cited psychologist Morgan's later opinion that, despite Plaintiff's verbal IQ of 70, "the performance aspects of [his] intellect were highly significant over the verbal

20

aspects." He also reported that "the claimant's presentation suggested that he would typically function between the low average to within the average range of intelligence.

The problem with the ALJ's finding in this regard is that, regardless of the psychologists' opinions regarding the performance IQ, Social Security's regulation expressly requires only "a valid verbal performance, **or** full scale IQ of 60 through 70." Plaintiff meets that requirement.

The parties do dispute whether Plaintiff exhibited deficits in adaptive functioning. The undersigned nevertheless finds Listing 12.05C is a relevant listed impairment in this matter. Therefore, the ALJ should have identified it and compared each of the listed criteria to the evidence of Plaintiff's symptoms. Cook, supra. "Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination."

For this reason alone, if the District Judge finds the claim should not be remanded for an award of benefits, the undersigned finds the matter should be remanded for further proceedings consistent with this Report and Recommendation.

### E. The Subsequent ALJ Decision

Plaintiff attached a subsequent favorable ALJ decision, which found Plaintiff disabled only 16 days after the previous ALJ found him not disabled. The favorable decision and an affidavit by Tina Landis (his Special Education Teacher/Employer) were not submitted at the Administrative level, for the simple fact that they did not exist prior to the Appeals Council decision. The Court therefore considers these documents new evidence to the Court. Although Plaintiff argues the favorable opinion is evidence that the earlier decision is not supported by substantial evidence, he does not expressly request remand based on new and material evidence to the Court.

Nevertheless, because the undersigned has already found and recommended the earlier ALJ

decision be reversed and remanded, it is unnecessary to consider the new evidence to the Court and it is therefore neither discussed nor considered in this Report and Recommendation.

## F. Conclusion

The decision of whether to reverse and remand for benefits or reverse and remand for a new hearing is one which "lies within the sound discretion of the district court." Edwards v. Bowen, 672 F. Supp. 230 (E.D.N.C. 1987); see Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984.) The Fourth Circuit has held that it is appropriate for a federal court to "reverse without remanding where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." Breeden v. Weinberger, 493 F.2d 1002 (4th Cir. 1974). In Breeden, the Fourth Circuit noted that "the statute governing review in Social Security cases authorized [the court] to reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" Id. at 1011-12 (citing 42 U.S.C. section 405(g), which provides that "[t]he [reviewing] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.). Because there was not substantial evidence in the record to support the ALJ's conclusion, and because the evidence as a whole compels a conclusion that Plaintiff meets Listing 12.05C, the undersigned concludes that the Commissioner is obliged to find in favor of the claimant in this case.

The undersigned therefore recommends the decision be reversed and remanded solely for the calculation and award of benefits. Should the District Judge disagree, the undersigned recommends the decision be reversed and remanded for a new hearing consistent with this Report and Recommendation.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is not supported by substantial evidence, and I accordingly respectfully **RECOMMEND** Defendant's Motion for Summary Judgment [Docket Entry 14] be **DENIED,** Plaintiff's Motion for Summary Judgment [Docket Entry 12] be **GRANTED,** and the decision of the Commissioner be **REVERSED and REMANDED** under sentence four of 42 U.S.C. section s 405(g) and 1383(c)(3), for calculation and an award of benefits.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record

Respectfully submitted this _4_ day of _February_, 2013.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

23