IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


JUSTIN L. RODRIQUEZ,

          Plaintiff,

v.                          CIVIL ACTION NO. 1:12CV99
                                 (Judge Keeley)

COMMISSIONER OF SOCIAL SECURITY,

          Defendant.


## MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

          Pursuant to 28 U.S.C. §636(b)(1)(B), Fed. R. Civ. P. 72(b), and L.R. Civ. P. 4.01(d), on June 19, 2012, the Court referred this Social Security action to United States Magistrate John S. Kaull with directions to submit proposed findings of fact and a recommendation for disposition.

          On February 4, 2013, Magistrate Judge Kaull filed his Report and Recommendation ("R&R") (dkt. no. 17) and directed the parties, in accordance with 28 U.S.C. §636(b)(1) and Rule 6(e), Fed. R. Civ. P., to file any written objections with the Clerk of Court within fourteen (14) days after being served with a copy of the R&R. On February 14, 2013, counsel for the defendant, Commissioner of Social Security ("the Commissioner"), filed objections to the R&R. (Dkt. No. 18).  On February 19, 2013, counsel for the plaintiff, Justin L. Rodriquez ("Rodriquez"), filed a response to the Commissioner's objections. (Dkt. No. 19).

**MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

## I. PROCEDURAL BACKGROUND

On January 12, 2009, Rodriquez filed an application for supplemental security income ("SSI"), alleging disability since June 5, 2007 due to "dyslexia and depression." (R. 133, 223). The Commissioner denied his application initially on January 11, 2009, (R. 72), and on reconsideration on April 15, 2009. (R. 90). After Rodriquez requested a hearing, an Administrative Law Judge ("ALJ") conducted a hearing on August 31, 2010, at which Rodriquez, represented by counsel[1], and an impartial Vocational Expert ("VE") appeared and testified. (R. 37-69).

On October 20, 2010, the ALJ determined that, despite severe impairments, including a reading disorder, mathematics disorder, disorder of written expression, and major depressive disorder (R. 24), Rodriquez was not disabled because there were a significant number of jobs in the national economy that he could perform. (R. 31). On April 20, 2012, the Appeals Council denied Rodriquez's request for review. Thus, the ALJ's decision became the final decision of the Commissioner. (R. 1). On June 19, 2012, Rodriquez

---

[1]    On April 7, 2009, Rodriquez's aunt retained Harold Bailey, Jr., an attorney, to represent him. (R. 89).

MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

timely filed this action seeking review of the final decision.
(Dkt. No. 1).

## II.  PLAINTIFF'S BACKGROUND

Rodriquez was born on March 29, 1986, and was twenty-four (24) years old at the time of the administrative hearing. (R. 38). His brief employment history includes work detailing cars for one and a half days, and work as a stock boy in a Dollar Store for approximately six months. The record reflects that he earned $35.68 in 2004, $673.97 in 2005, and $81.20 in 2006. (R. 137).

## III.  ADMINISTRATIVE FINDINGS

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ found as follows:

1.  Rodriquez has not engaged in substantial gainful activity since June 5, 2007  (20 CFR 416.971 et seq.);

2.  Rodriquez has the following severe impairments: reading disorder, mathematics disorder, disorder of written expression, and major depressive disorder (20 CFR 406.920(c)) that, alone or in combination, do not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926);

3.  Rodriquez has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: inability to perform jobs requiring reading, writing, or math, no

exposure to hazards, such as dangerous moving machinery
or unprotected heights, is limited to entry level,
unskilled, routine, repetitive work involving simple,
one-to-two-step instructions and working with things as
opposed to people, only limited contact with coworkers
and the public, and is limited to jobs requiring no
independent decision making or production line work;

4.    Rodriquez has no past relevant work history (20 CFR
      416.965);

5.    Rodriquez was born on March 29, 1986 and was 21 years old
      on the date the application was filed and is defined as
      a "younger individual age 18-49" (20 CFR 416.963);

6.    Rodriquez is functionally illiterate and is able to
      communicate in English (20 CFR 416.964);

7.    Transferability of job skills is not an issue because
      Rodriquez does not have any past relevant work (20 CFR
      416.968);

8.    Considering his age, education, work experience, and
      residual functional capacity, there are jobs that exist
      in significant numbers in the national economy that
      Rodriquez can perform (20 CFR 416.969 and 416.969a); and

9.    Rodriquez has not been under a disability, as defined in
      the Social Security Act, since June 5, 2007 (20 CFR
      416.920(g)).

(R. 22-32).

## IV.  OBJECTIONS

The Commissioner contends that Rodriquez failed to establish

that he had "significantly sub-average general intellectual

functioning with deficits in adaptive functioning initially

## MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

manifested during the developmental period caused by mental retardation" and therefore does not meet the threshold requirement of § 12.05C. (Dkt. No. 18). The Commissioner argues that § 12.05C requires Rodriquez "to satisfy the diagnostic description of the introductory paragraph of § 12.05C," as well as the criteria of the section itself. (Dkt. No. 18). He further argues that a subsequent award of benefits to Rodriquez in 2012 is not material because it was "based upon a different evidentiary background" and therefore does not merit remand of an earlier finding of non-disability. (Dkt. No. 18).

In response, Rodriquez contends that the "sole issue in this case is whether . . . [his] condition met the requirements of Listing 12.05C." (Dkt. No. 19). He argues that the ALJ should have evaluated his case using the criteria in § 12.05C rather than § 12.02, and asserts that he meets all of the criteria of § 12.05C. (Dkt. No. 19).

## V. <u>MEDICAL EVIDENCE</u>

The Court incorporates the magistrate judge's review of the procedural history of the claim, the results from the WISC-III and WRAT-3 tests, and the medical records contained in the R&R. (Dkt. No. 17, 2-11).

### MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Ths magistrate judge specifically noted the following history of testing and assessments:

1.    A September 28, 1999 Psychoeducational Evaluation report from David Wamsley, a Certified School Psychologist, indicating that at age thirteen and a half (13½), Rodriquez was just beginning seventh grade, believed he had repeated kindergarten but was not sure, and had received services for Learning Disabled Students. Wamsley noted that Rodriquez was dressed appropriately, was relatively reserved, spoke only when addressed by the examiner, and gave very brief responses and replies. The evaluator specifically noted that when asked what type of job he would like to have as an adult Rodriquez  replied that he wanted to be a "Valleyball player" which he clarified, when asked, that he really meant "Volley Ball." (R. 282).

Wamsley administered WISC-III testing that resulted in a Verbal score of 63, a Performance score of 86, and a full scale score of 72 (at the 1st, 18th, and 3rd percentile for an individual his age, respectively). (R. 283). Subtest scores were a one in Information, a three in Comprehension, a four in Vocabulary and Arithmetic, an eight in "Picture Arrangement," "Block Design," and "Object Assembly," and a nine in "Picture Completion." Wamsley

noted that "the average score is 10," and any change of three points or more is considered to be significant. Rodriquez did not achieve an average score of ten on any of the subtests. His highest score was a nine in "Picture Completion" and three eights on "Picture Arrangement," "Block Design," and "Object Assembly." (R. 283). Wamsley noted that Rodriquez's "General intellectual functioning fell within the upper end of the Mildly Mentally Impaired range," (R. 283) and that his nonverbal functioning, as indicated by the performance part of the test, fell within the lower average range. He further noted:

> In most test areas Justin struggled and scored well below normal.  This included:
>
> Information learned in previous home and school experiences.  This included long term memory for factual detail.
>
> Abstract thinking, including the ability to generalize from one learning situation to another.
>
> Basic Arithmetic reasons.  This involves using math computational skills that are age appropriate for solving the types of problems that might occur in every day life.
>
> Word knowledge including definitions, verbal expression and general verbal reasoning.
>
> Verbal logical problem solving.  This includes "common sense" reasoning associated with experiences considered typical of most students.

> Ability to make a quick transition from one item to
> another on a timed paper and pencil task.
>
> Justin's potential for success in regular classroom
> learning situations would appear to be somewhat lower
> than most students his age.  His weaknesses in the
> several verbal and one nonverbal areas suggest that he
> would have difficulty understanding and applying the
> complex types of information usually emphasized in the
> classroom.

(R. 284)(emphasis added).

Wamsley also noted that, consistent with the Performance IQ
test, the quality of Rodriquez's Human Figure Drawing Test was very
low average, that Rodriquez exhibited indicators suggesting anxiety
and tension, and that Rodriquez was self-conscious about his lack
of success in a variety of areas, particularly school work. He
further noted a number of errors on the Bender Visual Motor Gestalt
Test that reduced the overall score. He also noted that Rodriquez's
"Fine motor skills were found to be far below the level expected of
a young man his age," including "uneven and distorted line control
to complete basic geometric shapes." (R. 284).

> Rodriquez's achievement tests results were:
>
> Basic Reading-first grade, -1 percentile.
> Mathematics Reasoning – third grade, 4th percentile.
> Spelling- second grade, 1st percentile.
> Reading Comprehension – first grade, -1 percentile.
> Numerical Operations – second grade, -1 percentile.

The composite of the above was grade one for reading and grade two for math, at the -1 and 1st percentile, respectively, scores that reflect Rodriquez scored as well as, or better than, only one percent (1%) of students his age on the test. (R. 285).

Significantly, Wamsley indicated that Rodriquez had extreme deficits in all academic areas, was almost a nonreader and, apparently, had not yet learned addition, subtraction or multiplication facts. He further noted that Rodriquez relied on making marks on paper to solve relatively low level items. (R. 285).

Wamsley opined that Rodriquez's "extreme deficits in basic reading, spelling, and arithmetic would appear to be major factors limiting his opportunity for success in [a] regular classroom." He further concluded: "Many of his learning characteristics appear to be similar to those associated with students functioning in the Mildly Mentally Impaired Range." (Emphasis added). Wamsley stated:

> On the other hand, he demonstrated low average functioning in selected nonverbal parts of the WISC-III and his Performance score would be considered well within the lower average range. Using this as a point of comparison, he would also appear to have some of the characteristics associated with students considered Learning Disabled.

MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION

(R. 285).

Wamsley recommended 1) services for Mildly Mentally Impaired students or continuation of services for Learning Disabled students, 2) possible access to educational programs emphasizing "hands on" involvement, 3) development of learning materials fashioned to accommodate his inability to read or spell above the first grade level, 4) material that teaches how to recognize survival words such as men, women, exit, and how to manage money, compare costs of consumer items, and recognize how much change he should receive, and 5) reinforcement for making an effort to complete an assignment to help develop self confidence. (R. 285-6);

2. A November 18, 1999 report from the Eligibility Committee, Upshur County, regarding an Individualized Education Program ("IEP") for Rodriquez, indicating that the committee found Rodriquez's general intellectual function to be at or above one standard deviation below the mean and, based on his performance IQ, continued him in the Specific Learning Disabilities program. (R. 161);

3. An April 19, 2001 IEP indicating Rodriquez's goals at age fifteen (15) were to live at home through high school, graduate from high school, possibly train to become a painter, and obtain a

driver's license. It noted that Rodriquez had no community activities, was enrolled in Severe Learning Disability Classes for reading and math, read at the lower third-grade level but had shown improvement in his "basic operations involving addition, subtraction, and multiplication and division using one digit." The report recommended that Rodriquez participate in a Special Education Environment in Reading, Math, English, Health, and Science. A subsequent addendum to the IEP added Social Studies to the list of Special Education classes and increased the percentage of time Rodriquez spent in Special Education to eighty-six percent (86%). It did not recommend employment, living skills, and functional vocational evaluation at that time. (R. 149-56);

    4.    A June 26, 2007 Mental Assessment from Morgan D. Morgan, M.A., a psychologist, performed for the State agency indicating Rodriquez was twenty (20) years old, was appropriately groomed and attired, drove himself to the appointment accompanied by his aunt, was cooperative and compliant, was applying for disability due to problems with reading, spelling, and math, lived with his grandmother, brother and an uncle, and received only food stamps. He reported that he had last worked in January 2006 and felt that

he most likely lost the job due to his poor reading skills. (R. 305).

Rodriquez reported a typically happy mood, a good appetite, ability to sleep, normal energy, no suicidal ideations, no mental health treatment, no participation in organized school activities, no history of disciplinary problems, leaving school in the ninth (9th) grade, never being married, no children, and having a steady girlfriend from 2003-2005. Significantly, he stated that he had obtained his driver's license after being given the test orally seven times.

During the Mental Status Examination, Morgan noted Rodriquez was appropriately attired, had good hygiene and grooming, had nonprofessional tattoos on his hands and arm, was cooperative and compliant, had normal eye contact, had mildly deficient spontaneity, had normal verbal responses, displayed a mild level of introversion, had normal speech, was oriented to time, name and place, but was unsure of the date.  His mood was cheerful, and he displayed a broad range of affect. He demonstrated mildly deficient insights, poor judgment, normal immediate recall, mildly deficient remote recall, severely deficient recent recall, and mildly deficient concentration.

Morgan noted the results of the WRAT-3 testing as a verbal score of 70, a performance score of 91, and a full scale score of 78. He further noted that, although the results were valid and appeared to be based on good effort, the significant differential between the verbal and performance aspects indicated a history of learning disorders in all three major spheres of academic achievement. Based on the significant differential between the verbal and performance results, he determined that the full scale IQ was not a good indicator of Rodriquez's overall intelligence and suggested that he would typically function in the low average to average range of intelligence. (R. 305).

The achievement test scores established that Rodriquez read and performed arithmetic at the 2nd grade level and spelled at the 3rd grade level. Morgan diagnosed a Reading Disorder, Mathematics Disorder, and Disorder of Written Expression, a poor prognosis and indicated that Rodriquez would struggle to appropriately manage his own finances. (R. 305-09);

5. A July 2, 2007 Mental Residual Functional Capacity Assessment ("MRFC") from James W. Bartee, Ph.D., based solely on the criteria from Listing 12.02, Organic Brain Disorder, indicating marked limitation in ability to understand, remember, and carry out

detailed instructions, moderate limitation in ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, ability to perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in the work setting, and to set realistic goals or make plans independently of others, and significant limitation in any other mental activity. (R. 316);

6.    A July 2, 2007 Psychiatric Review Technique ("PRT") from Dr. Bartee based on Listing 12.02 for organic mental disorder, which indicated that Rodriquez had only learning disabilities. He concluded Rodriquez had  mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and had experienced no episodes of decompensation. (R. 316);

7.    A March 2, 2009 mental assessment from Dr. Morgan for the State agency (R. 338) indicating Rodriduez was now nearly twenty-three (23), was adequately groomed and attired, had driven himself and his aunt to the appointment, was cooperative and compliant and had mildly retarded motor function. Rodriquez reported applying for

disability due to his history of special education with poor reading, math, and spelling, along with depression. Rodriquez reported recurrent, depressive episodes, struggles with attention and concentration, forgetfulness, easily becoming frustrated and irritable, being socially withdrawn, experiencing problems sleeping due to ruminations over stressors, occasional suicidal ideations, but said he would not commit suicide due to his friends' affection and assistance, sometimes not eating for days and eating less when he did eat, and crying spells. He stated that he became unable to work in 2006 due to his spelling problems.

Mr. Morgan observed that Rodriquez'a grooming and hygiene were adequate even though he noted Rodriquez's hair was somewhat oily and it appeared that he may not have bathed in the last day or so (R. 340). He further noted that Rodriquez had a dysphoric mood, slightly restricted affect, mildly deficient insights, poor judgment, mildly deficient immediate recall, mildly deficient recent recall, mildly deficient remote recall, mildly deficient concentration, and displayed motor retardation during the assessment.

Without repeating any testing, Morgan diagnosed major depressive disorder, recurrent, severe, without psychotic features,

reading disorder, mathematics disorder, and disorder of written expression (R. 341); and

8.    A March 10, 2009 Mental Residual Functional Capacity Assessment ("MER") from James W. Bartee, Ph.D, a State agency reviewing psychologist, indicating that "with the exception of 'getting along,'" the MER supported Rodriquez's other alleged limitations and "seem to be generally credible." (R. 344-47). Bartee also completed a Psychiatric Review Technique based on organic mental disorders and affective disorders and determined that Rodriquez would have moderate difficulties in maintaining social functioning and concentration, persistence or pace, mild restriction of activities of daily living, and had experienced no episodes of decompensation. Bartee noted that in 1999 Rodriquez'a WISC-III results revealed a verbal IQ of 63, a performance IQ of 86 and a Full Scale IQ of 78. (R. 348-61).

## VI.  DISCUSSION

### A. Scope of Review

The scope of review of an administrative finding of no disability is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456

### MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

(4th Cir. 1990). In <u>Smith v. Schweiker</u>, 795 F.2d 343, 345 (4th Cir.1986), the Fourth Circuit described the scope of review as "specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." <u>Id.</u> Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (<u>quoting</u> <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict where the case is before a jury, then there is 'substantial evidence.'" <u>Hays</u>, 907 F.2d at 1456 (<u>quoting</u> <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). And, in <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987), the Fourth Circuit held that "[A] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." 829 F.2d 514, 517 (4th Cir. 1987).

### B. <u>Failure to Evaluate under Section 12.05</u>

**MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

In the magistrate judge's determination, the ALJ erred by failing to evaluate Rodriquez pursuant to § 12.05C. At the third step of the sequential evaluation, an ALJ must determine whether a claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(e)). If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 416.909), that claimant is disabled. If not, the ALJ's analysis proceeds to the next step.

Here, at Step Two of the sequential evaluation, the ALJ found that Rodriquez had severe impairments - "reading disorder, mathematics disorder, disorder of written expression, and major depressive disorder." (R. 24). The ALJ adopted the line of reasoning followed by the school and consulting agency psychologists, both of whom had concluded that, despite a verbal IQ within the mentally-retarded range, Rodriquez was better diagnosed with severe disorders of reading, math, and written expression, and proceeded at step three to evaluate Rodriquez pursuant to § 12.02 for organic brain disorder rather than pursuant to § 12.05C, mental retardation.

As a basis for this decision, the ALJ stated:

As detailed above, the claimant's verbal I.Q. score on
the WAIS-III testing administered in June 2007 was 70.
However, consistent with the prior assessment submitted
by the state agency psychological consultants (Exhibits
67F, 11F, and 12F), the claimant's significant poor
academic ability has been evaluated under Section 12.02
of Appendix 1, dealing with organic mental disorders, as
opposed to Section 12.05, dealing with mental
retardation. In this regard, the claimant's I.Q. testing
as a child and as an adult establish that the claimant's
performance aspect (performance I.Q. of 91 on the June
2007 testing) are highly significant over the verbal
aspects. Further Psychologist Morgan reported that the
claimant's presentation suggested that he would typically
function between the low average to within average range
of intelligence (Exhibit 4F). <u>The overall record fails to
establish that the claimant satisfies the threshold
requirement of Section 12.05, significantly sub-average
general intellectual functioning with deficits in
adaptive functioning initially manifested during the
development period</u>. The undersigned [ALJ] has also
resolved all doubts in the claimant's favor in finding
that he had an affective disorder, with this condition
evaluated under Section 12.04 of Appendix 1. (Emphasis
added).

(R. 26.)

In support, the ALJ relied on the following evidence of

record:

1.   That Rodriquez quit school before completing the ninth

grade, and had a history of being retained in kindergarten and

being in special education classes throughout his academic

schooling;

2.   The IQ scores at age 13 and his achievement testing revealed that he read at a one year seven month level and did math at a two year eight month level;

3.   That Wamsley believed that the major factors limiting Rodriquez's opportunity to succeed in a regular classroom were his extreme deficits in basic reading, spelling and arithmetic;

4.   That, although many of Rodriquez's learning characteristics were similar to those associated with students functioning in the mildly mentally impaired range, Wamsley's assessment was that Rodriquez demonstrated low average functioning in selected non-verbal parts of the IQ testing and that his performance score would be considered well within the lower average range. Wamsley also noted that Rodriquez appeared to have some of the characteristics associated with students considered to be learning disabled;

5.   That the February 15, 2011 mental status examination from Wilda Posey, a state agency consultant and licensed psychologist, noted that Rodriquez's concentration appeared average, his persistence was within normal limits, his pace was slow, and his immediate memory was within normal limits. His recent memory, however, appeared to be severely deficient. Posey further noted

**MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

that Rodriquez would not be considered able to manage his own finances given his reported problems with learning, reading and mathematics;

6.    That the August 25, 2011 report from Robert Klein, a state agency consultant and licensed psychologist, indicated that Rodriquez had IQ scores of full scale 75, verbal 68 and perceptual reasoning adult 86 and that, although his verbal comprehension and working memory appeared to be in the mildly mentally impaired range, his overall IQ demonstrated that he would be at the borderline level with an additional indication that he had an unspecified mood disorder; and

7.    That the March 2011 psychiatric review technique from Dr. Jeff Boggess, a state agency medical consultant, indicated Rodriquez had no restrictions as to activities of daily living or maintaining social functioning, a moderate restriction as to concentration, persistence and pace. (R. 25-6).

After a thorough review of the record, pursuant to <u>Jackson v. Astrue</u>, 467 Fed. Appx. 214, 2012 WL 580239 (4th Cir. 2012)(unpublished),[2] the magistrate judge determined that the

---

[2]    Pursuant to F.R.A.P. 32.1(a) and (b), a copy of <u>Jackson</u> is attached.

evidence of record did not substantially support the ALJ's decision

to evaluate Rodriquez using § 12.02 rather than § 12.05C.

Section 12.00 provides, in pertinent part:

The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). <u>If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.</u> Paragraphs A and B contain criteria that describe disorders we consider severe enough to prevent your doing any gainful activity without any additional assessment of functional limitations. For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to perform basic work activities, *i.e.*, is a "severe" impairment(s), as defined in section 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in sections 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 section 12.00 (emphasis added).

Section 12.05C provides:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

**MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

---

The required level of severity for this disorder is met
when the requirements in A, B, C or D are satisfied . .
. .

C.  A valid verbal, performance, **or** full scale IQ of 60
through 70 and a physical or other mental impairment
imposing an additional and significant work-related
limitation of function . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 section 12.05C (emphasis
added).

As the magistrate judge noted, in <u>Jackson</u> the Fourth Circuit
addressed whether an ALJ had properly evaluated Jackson at the
third step of the sequential evaluation to determine that she
satisfied the criteria of § 12.05C. <u>Jackson</u> based its decision on
evidence of deficiencies in functional academic skills,
social/interpersonal skills and communication, self-care, safety
and health, and Jackson's testimony that she had attended special
needs classes, had dropped out of school in the tenth grade, had
been unable to obtain her GED, read at a sixth-grade level, and had
been evaluated as within the "mildly mentally retarded range of
intellectual functioning."

The Fourth Circuit noted that the school records[3] provided by
Jackson established she was a special needs student as early as the

---

[3]    Jackson submitted her school records to the Appeals
Council not the ALJ because, due to their age, she had been unable
to obtain them prior to the ALJ's ruling.

seventh grade. "What is more, they [the additional records] state that further academic testing during that time showed Jackson to be severely deficient in her intellectual abilities, and in particular, reported her as having a verbal IQ of 67." Id. at 218.

Based on all this evidence, the Fourth Circuit concluded:

> Not only did these forms provide documentation that the ALJ's decision was lacking and eliminate the ALJ's very reason for denying Jackson's claim, they also reinforced the credibility of Jackson's testimony. Moreover, information reflected in the school record is directly material to the final prong of Listing 12.05C – the question of whether Jackson suffered "significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period . . . before age 22."

Id. (Emphasis added).

The Fourth Circuit determined that Jackson satisfied the requirements of § 12.05C based on IQ scores from a court ordered IQ test in the 60-70 range, her childhood school records, and her severe impairments of depression and diminished intellectual functioning. Ultimately, the Court remanded Jackson's case for consideration of the school records as new material evidence because, while Jackson had submitted the school evidence to the Appeals Council, she had not presented it to the ALJ. Id.

In <u>Jackson</u>, the Fourth Circuit also addressed the type of evidence that would support a finding of deficits-in-adaptive-behavior requirement and concluded:

> Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.

<u>Id.</u> (<u>citing</u> <u>Atkins v. Virginia</u>, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)).

Here, the evidence submitted by Rodriquez on the issues of valid IQ scores and adaptive behavior mirrors that in <u>Jackson</u>. He was a special needs student the entire time he attended school. He repeated kindergarten or first grade. He read at a first grade level and performed math at the second grade level while in the seventh grade. By the time he was in the ninth grade, he had spent eighty-six percent (86%) of his time in Special Education classes. He had valid IQ scores at age thirteen of 63 Verbal, 86 Performance, and 72 Full Scale. At age 20, his valid IQ scores were 70 Verbal, 91 Performance, and 78 Full Scale. He was unable to maintain employment. He depended on his family for instructions on how to complete basic everyday tasks. He was unable to manage his limited finances. He had no social activities outside of his

immediate family. He suffered from depression and anxiety. Thus, as in <u>Jackson</u>, Rodriquez had valid IQ scores within the required range, as well as deficits in adaptive behavior initially manifested during the developmental period and before age twenty-two.

Based on 20 C.F.R. pt 404, subpt. P, App. 1, section 112.00(D)(10), the Commissioner argues that Rodriquez's IQ scores at age 13 should not be regarded as proof of his general intellectual functioning in the Mildly Mentally Impaired Range, and should not be considered as current evidence of his functioning under the regulations. However, under 20 C.F.R. pt 404, subpt. P, App. 1, section 112.00(D)(10), "[t]he regulations state that a child's IQ score tends to stabilize by the age of 16; therefore, IQ test results obtained before age 16 are considered current for only two years when the IQ is above 40." <u>Id.</u> Here, the record documents that Rodriquez's IQ scores at age twenty remained virtually the same as at age thirteen (70 Verbal, 91 Performance, and 78 Full Scale) compare to (63 Verbal, 86 Performance, and 71 Full Scale), and thus were within the required range of 60-70.

Moreover, in <u>Rainey v. Heckler</u>, 770 F.2d 408 (4th Cir. 1985), the Fourth Circuit held that "<u>[w]here more than one IQ is derived</u>

from the administered IQ test, the lowest score is to be used in conjunction with 12.05C." (Emphasis added.) Rodriquez's verbal IQ score of 63 at age thirteen and his verbal score of 70 in 2007 at age twenty both are clearly within the range of 60 through 70. Importantly, as required, both evaluators considered the scores on the IQ tests to be valid and concluded that Rodriquez had made a good effort during the tests. (R&R at 20.)

Inasmuch as mental retardation is a lifelong condition, a claimant must show that the condition predates age twenty-two. Luckey v. United States Dept. of Health and Human Services, 890 F.2d 666 (4th Cir. 1989)("Mental retardation refers to a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22" ))(citing 20 C.F.R. Pt. 404, Subpt. P, App. 1 section 12.05.). The magistrate judge determined that Rodriquez satisfied this requirement based on his Verbal score of 63 on the first IQ test at age 13, his Verbal score of 70 at age 20, his testimony that he had repeated kindergarten or first grade, and had spent the majority of his time in school in special education classes. (R&R at 20).

**MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Finally, the magistrate judge determined that Rodriquez satisfied the requirement of "an additional and significant work-related limitation of function" due to the ALJ's finding at step two of the sequential evaluation that Rodriquez had a severe impairment of major depressive disorder (R. at 12). A "severe impairment" is defined as one that significantly limits an individual's ability to perform basic work activities, 20 C.F.R. section 416.920(c).

For these reasons, the magistrate judge determined that the record did not support the ALJ's decision to evaluate Rodriquez under § 12.02 rather than § 12.05C. He further determined that the record, in fact, established that Rodriquez had satisfied all of the criteria of § 12.05C and recommended that, pursuant to § 12.05C, the Court find Rodriquez disabled since June 5, 2007, and remand the case to the Commissioner for an award of benefits. (R&R at 21).[4]

---

[4]    Alternatively, the magistrate judge recommended that the Court reverse and remand the case for further evaluation at Step Three of the sequential evaluation pursuant to the specific criteria of § 12.05C. As a basis for this recommendation, he noted that, at Step Three of the sequential evaluation, an ALJ must identify the relevant listed impairments and compare the evidence of a claimant's symptoms to the criteria for that listing.

Here, because the ALJ chose to evaluate Rodriquez pursuant to § 12.02 rather than § 12.05C, the ALJ's opinion does not contain a

### C. Subsequent Award of Benefits

The Commissioner argues that the subsequent award of benefits to Rodriquez in 2012 was "based upon a different evidentiary background" (dkt. no. 18) and is not material evidence that merits a remand of an ALJ's earlier finding of non-disability because it was related to a later time period. As the magistrate judge noted, however, only sixteen days after the unfavorable decision in this case, another ALJ awarded benefits to Rodriquez.

The magistrate judge noted that the favorable decision and the affidavit from Tina Landis, Rodriquez's special education teacher/employer,[5] were not considered at the Administrative level

---

comparison and statement of reasons outlining the reasoning related to an evaluation of Rodriquez pursuant to §12.05C. See Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986)("The ALJ should have identified the relevant listed impairments. He should then have compared each of the listed criteria to the evidence of Cook's symptoms. Without such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination."). For this reason alone, the magistrate judge recommended that, should the Court decline to remand for an award of benefits, the matter be remanded for further proceedings consistent with the R&R. Based on its finding that the record does not contain substantial evidence denying coverage under § 12.5C, the Court sees no need to do so.

[5]     Tina Landis was a special education teacher who worked with a non-profit program called "Mountain Cap" that served disadvantaged youth and tried to provide them educational skills necessary to pass the GED, work skills, and social skills to

because at that time they did not exist. (R&R at 21). Even though he considered these documents new evidence that might warrant remand for consideration, as he had already recommended that the Court reverse the ALJ's decision and remand for an award of benefits, the magistrate judge determined "it is unnecessary to consider the new evidence to the Court and it is therefore neither discussed nor considered in this Report and Recommendation." (R&R at 22).

### D. <u>Reverse and Remand for Award of Benefits</u>

The decision whether to reverse and remand for benefits or reverse and remand for a new hearing is one "within the sound discretion of the district court." <u>Edwards v. Bowen</u>, 672 F. Supp. 230 (E.D.N.C. 1987); <u>see</u> <u>Evans v. Heckler</u>, 734 F.2d 1012 (4th Cir. 1984). The Fourth Circuit has held that it is appropriate for a federal court to "reverse without remanding where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose." <u>Breeden v.</u>

_____

transition into independent adult living. She helped Rodriquez obtain a job as a stock boy in a Dollar Store that, without constant supervision by his brother, who had been hired at the same time, he was unable to do even this simple, repetitive job. (R&R at 3).

**MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

Weinberger, 493 F.2d 1002 (4th Cir. 1974). Breeden noted that "the statute governing review in Social Security cases authorized [the court] to reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'" Id. at 1011-12 (citing 42 U.S.C. section 405(g), which provides that "[t]he [reviewing] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.).

After an extensive review of the evidence, the magistrate judge determined that there was no substantial evidence in the record supporting the ALJ's decision. Moreover, he concluded the record establishes that Rodriquez satisfied the threshold requirement as well as the requirements of § 12.05C. He therefore recommended that the Court reverse and remand this matter to the Commissioner solely for the calculation and award of benefits. The Court agrees.

## VII. CONCLUSION

Neither the Commissioner nor Rodriquez has raised any issues that were not thoroughly considered by Magistrate Judge Kaull in his R&R. Moreover, the Court, upon an independent de novo

**MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

consideration of all matters now before it, is of the opinion that the R&R accurately reflects the law applicable to the facts and circumstances in this action.  Therefore, it **ACCEPTS** Magistrate Judge Kaull's R&R in whole and **ORDERS** that this civil action be disposed of in accordance with the recommendation of the Magistrate Judge.  Accordingly,

1.  The Court **DENIES** the defendant's motion for Summary Judgment (Docket No.  14);

2.  The Court **GRANTS** the plaintiff's motion for Summary Judgment (Docket No. 12);

3.  The Court **REVERSES** the decision of the ALJ and **REMANDS** the plaintiff's claim to the Commissioner for a calculation and award of benefits; and

4.  **DISMISSES** this civil action **WITH PREJUDICE** and **ORDERS** that it be **RETIRED** from the docket of this Court.

Pursuant to Fed.R.Civ.P. 58, the Court directs the Clerk of Court to enter a separate judgment order and to transmit copies of this Order to counsel of record.

If a petition for fees pursuant to the Equal Access to Justice Act (EAJA) is contemplated, the plaintiff is warned that, as

**MEMORANDUM AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**

announced in <u>Shalala v. Schaefer</u>, 113 S.Ct. 2625 (1993), the time

for such a petition expires in ninety days.

DATED: August 19, 2013.

<u>/s/ Irene M. Keeley</u>
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE